IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 4, 2011

## LARRY HOLMES v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 03-02148        Paula L. Skahan, Judge**

---

**No. W2010-02672-CCA-R3-PC  - Filed April 20, 2012**

---

The Petitioner, Larry Holmes, appeals the Shelby County Criminal Court's denial of post-conviction relief from his convictions for four counts of especially aggravated kidnapping, two counts of aggravated robbery, and one count of aggravated burglary, and resulting effective sentence of seventy years.  The trial court merged the aggravated robbery convictions with the especially aggravated kidnapping convictions.  The Petitioner contends that he was denied due process when the trial court failed to dismiss the kidnapping convictions and that he received the ineffective assistance of counsel on appeal.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ALAN E. GLENN, JJ., joined.

David Christensen, Brentwood, Tennessee, for appellant, Larry Holmes.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Doug Carriker, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Petitioner's convictions resulted from an October 16, 2002 home invasion robbery.  This court summarized the trial testimony in its opinion disposing of the Petitioner's direct appeal:

This case relates to the invasion of the home of Trina Boyce at approximately 4:00 a.m. on October 16, 2002, by an undetermined number of intruders. Ms. Boyce testified that she lived with her brother, husband, and five children. She said that the house was a split-level style home with the main entrance on the first level and from the entryway, a set of stairs led to a lower level from which one can access the back yard, the swimming pool, and the lake. She said the first level had a deck overlooking the swimming pool. She said that on the night of October 15, 2002, her husband was out of town on business and that she was at home with her brother and five sons who at that time were ages three, five, and the remainder were teenagers. She said that her husband called from Dallas, Texas, at approximately 1:30 a.m. the morning of October 16 and that she talked to him for about one hour. She said that at about 3:30 a.m., their dog began barking and would not stop. She said that a few minutes later, her son Demarcus came upstairs wanting to borrow one of her miniskirts for a cheerleading skit at school. She said she sent him back downstairs and shortly thereafter, began hearing a pounding sound like an unbalanced washing machine. She said that she got up and went to the foyer because the dog was still barking and that she then heard voices at the front door saying, "Hurry up, hurry up." She said she yelled to Demarcus that someone was trying to break into the house, closed the foyer door, and headed for her bedroom where her two youngest children were sleeping.

Ms. Boyce testified that by the time she reached her bedroom door, she could see the first man entering the house wearing a ski mask and dark clothing. She said that they were claiming to be the police but that she knew the police did not wear masks. She said that the second man was wearing a sweat suit and a hooded shirt and that she could not see his face. She said that she locked the bedroom door but that the men pounded on it and eventually kicked it in. She said that they entered the bedroom and said, "B* * * *, where's your husband? We going to kill your m* * * * * f* * * * * * husband." She said she told the men her husband was not home, at which point they made her lie down and handcuffed her wrists behind her. She said the men asked where she kept the drugs, jewelry, and safe. She said

-2-

she told them she did not have any money, a safe, or any drugs in the house. She said she could hear the men ransacking the house and asking each other, "Where is the s* * *?" She said that she heard one of them direct the others to check downstairs and upstairs and that they asked her how many people were in the house. She said she told them but the number of persons found did not coincide with her information because Demarcus had escaped. She said the men began looking for Demarcus.

Ms. Boyce testified that when the men left her alone to look for Demarcus, she crept downstairs and found her other two teenage sons and her brother handcuffed and lying on the ground. She said she hid downstairs and then heard some of the men yelling that she had escaped. She said that while they began to look for her outside, she went upstairs to get her two younger children. She said that she was still in handcuffs but that she was able to put one son on her back and the other followed her. She said that when she returned downstairs with both children, she heard the men running and yelling, "It's the police. It's the police." She said the men made lots of noise and then jumped off the back deck. She said police officers arrived shortly thereafter. She said they removed the handcuffs from her and her family, searched the house, and apprehended two of the intruders. She said that she heard four different voices during the incident but that she saw only two men, the first person who entered the house and the man directly behind him. She said that the police recovered her wallet, checkbook, and identification and that they retrieved a purple Crown Royal bag containing quarters which she had kept in a nightstand drawer in her bedroom.

Ms. Boyce testified that the first man to enter the house carried a dark-colored semi-automatic weapon. She said that one man threatened to kill her husband and that another told her he would kill her if she did not tell them the location of the drugs and money. She acknowledged that she was placed in fear and held against her will. She said that apart from believing that she recognized the voice of one intruder, she was unable to identify any of the men who broke into her house.

-3-

On cross-examination, Ms. Boyce acknowledged that she could not identify the [Petitioner] as one of the perpetrators and that she told the police there may have been as many as five or six intruders that morning. She said that the entire episode lasted twenty to twenty-five minutes and that she was upstairs for fifteen to twenty minutes. She said her brother and two thirteen-year-old children were handcuffed and lying on their stomachs on the floor downstairs. She said that an eight-foot fence separates her property from that of the neighbor on the north side, that the lake is about one hundred feet from the back door entrance to the house, and that the backyard may be entered through two gates, one on either side of the house. She acknowledged that her mouth was not gagged, her feet were not tied, and nothing was placed over her head during the break-in.

Demarcus Teheir Boyce testified that on the morning the intruders invaded his home, his dog woke him earlier than usual. He said his bedroom was downstairs and located the farthest distance from the stairway. He said that he thought the dog needed to go outside and opened the back door but that she would not go outside and went upstairs instead. He said he followed her. He said the time was 4:25 or 4:30 a.m. He said that the dog started barking near the front door when he started to eat breakfast and that he went to the dining room window to check outside but before he reached the window, he heard someone at the front door. He said the noise sounded like "metal and stuff being turned and banging." He said his mother thought the noise was coming from him and asked what he was doing. He said that as she walked to the front door, he saw a van in the driveway and the shadow of someone standing at the door who told the dog to shut up. He said that his mother told him to go and ran toward her bedroom and that he then ran to the kitchen and out the back door. He said that he stood at the window for a moment and watched someone kick in the front door and run toward his mother's bedroom with a gun. He said he saw a second man enter the house but did not see either man's face. He said he ran toward the lake, jumped a couple of fences, and ran across the street to the home of a neighbor, who called the police.

On cross-examination, Demarcus acknowledged that he did not know the [Petitioner] and had never seen him before. He acknowledged that he did not wear eyeglasses or contact lenses.

Andre Weathers, Trina Boyce's brother, testified that he occasionally lived with the Boyce family and was staying at their house when the incident occurred. He said he slept in the guest bedroom located downstairs. He said that on October 16, 2002, at approximately 4:30 a.m., he heard voices upstairs and a rumble, like someone kicking in the door. He said he could discern running and movement but did not recognize the voices. He said he went to the bottom of the stairs and heard a few of the men say they were the police and looking for something. He said that he heard another man say someone is downstairs and that he attempted to return to his room but one of the men came downstairs, stopped him, and instructed him to lie flat on the ground with his hands behind his back. He said that because it was dark, he could not see what the man was wearing or any details concerning his appearance. He said that the man had a [nickel]-plated handgun but that he could not tell the caliber of the weapon. He said the man handcuffed his wrists, picked him up by the handcuffs, and asked him who else was downstairs. He said he replied that his two nephews, A.J. and Arron, were sleeping in a bedroom down the hall and called their names. He said that the boys did not respond immediately and that he called them again. He said a second man arrived just as the boys emerged from their bedroom. He said they were handcuffed and placed face down on the ground together.

On cross-examination, Mr. Weathers estimated that five or six men were involved in the incident. He acknowledged that in his statement to police, he said one of the men had a .38 caliber nickel-plated revolver and the other had what resembled a 9 millimeter or a .45 caliber black semi-automatic weapon. He acknowledged that his face and mouth were not covered and that his feet were not bound. He said that even when the men left the area downstairs, he was frightened and unable to get up or move around until the police arrived.

-5-

Arron Boyce testified that on October 16, 2002, he was awakened by his brother, A.J., who told him their uncle was calling them. He said he and his brother shared a bedroom on the downstairs level, where the bedrooms of his uncle Andre and Demarcus were also located. He said he went into the hallway and saw his uncle standing with his hands behind his back and a gun pointed at his head. He said that his uncle told him to do whatever the gunman said and that the man instructed the boys to get on their knees and put their heads down. He said that the man was short and wore dark clothes and a mask and that a second man who was taller and light-skinned joined them. He said the men put handcuffs on him and his brother, claimed they were the police, and asked them where the money was. He said that after the men placed him and his brother face down on the ground alongside his uncle, he noticed the handcuffs were made of plastic. He said that when the two men went upstairs, he removed his handcuffs and also helped A.J. remove his. He said he had contact with only two of the intruders and did not recognize either one, except that one of them had a familiar voice.

On cross-examination, Arron acknowledged that he did not know the [Petitioner] and had never seen him at their house. He acknowledged that his mother was moving about the house even though handcuffed and that he could have moved about the house if he had wanted. He conceded that he was only "kept down" while the men were present but said that they had instructed the victims to stay where they were.

Anthony Boyce, nicknamed "A.J.", testified that on October 16, 2002, he was awakened at approximately 4:20 a.m. by his uncle repeatedly calling his and his brother's names. He said that he woke Arron and that they went into the hallway. He said that as soon as they left their room, two men told them to get on the floor. He said they complied and, two minutes later, were instructed to go back down the hallway where handcuffs were placed on their wrists. He said they were then told to get down again. He said he recognized the voice of one of the men as a friend of his father, and he identified one of the codefendants in court. He said that the man asked them the

-6-

location of the money and that both men had guns. He said one man had a gun pointed at his uncle's head. He said that the men left to look for Demarcus and that he heard them run out the door when someone said "police." He said the police arrived and removed the handcuffs.

On cross-examination, A.J. acknowledged that he had never seen the [Petitioner] before that day. He acknowledged that he did not realize the handcuffs were plastic until his brother told him. He acknowledged that his mother was moving about the house, even though handcuffed, and that he also could have moved. He denied that any of them moved after learning the handcuffs were fake and said that they all stayed on the ground until the police arrived. He conceded that his feet were not bound and that his mouth was not gagged.

Memphis Police Officer David Beckham testified that on October 16, 2002, he arrived at the house at approximately 4:30 a.m. He said that other police officers were already present and that he heard yelling in the backyard. He said he ran to the back and observed Officers Jordan and Baker taking a suspect into custody. He testified he overheard the suspect say he was in the market to buy some real estate property and was looking at the backyard because he was interested in purchasing the house. He identified the codefendant, Jones, as the suspect in custody. He said he then entered the house and found two adults, two young children, and two teenagers on the floor. He said at least three were in handcuffs. He said he secured the house and began removing the handcuffs. He said one of the teenagers had removed the handcuffs himself. He said the female adult was crying, the male adult was angry, and the teenagers were nervous and frightened.

On cross-examination, Officer Beckham testified that he recalled seeing the [Petitioner] either in the victims' backyard or in the back of the police car on the day of the incident. He said the victims were able to give only general descriptions of the perpetrators: five to six African-American males wearing dark clothing. He acknowledged that they gave no details regarding facial characteristics. He said the officers recovered three

handguns, several ski masks, and the victim's property, which was scattered throughout the backyard.

Memphis Police Officer Michael Bach testified that he responded to the call regarding the home invasion robbery in progress at the victims' house. He said that other officers were present when he arrived at approximately 4:30 a.m. and that he and Officer Beckham assisted in securing the house. He said Officer Beckham helped the victims out of their handcuffs while he went to the backyard and helped search for suspects. He said the officers found the [Petitioner] hiding in some shrubs under a dock or pier in the backyard of the neighbor's house. He said that Officer Baker removed the [Petitioner] from the bushes and handcuffed him. He said that the [Petitioner] complained he had two broken legs and that he was transported to the hospital. He said that he and his partner, Officer Cave, went to the hospital and recovered from the [Petitioner] a purple Crown Royal bag containing some quarters. He identified the bag recovered from the [Petitioner] at the hospital and acknowledged that his name and that of Officer Cave was written on the evidence envelope.

On cross-examination, Officer Bach was asked if he recovered the purple Crown Royal bag, and he replied he did not. He also admitted that he was not present when the bag was discovered. He said Officer Cave recovered the bag from the [Petitioner] and then told him about it. He conceded that he did not know the [Petitioner] was in fact "hiding" in the bushes and that he did not know what the [Petitioner] was doing in the bushes or how he came to be there.

Memphis Police Officer William Harsley testified that he worked in the crime response unit and responded to a call to take photographs and collect and tag evidence at the crime scene. He said he collected a .45 caliber pistol and a .38 caliber pistol. He acknowledged he did not lift fingerprints from any of the evidence collected, including the pistols. He explained that due to the texture of the weapons, they would have to be chemically processed because the fingerprints could not be removed with powder.

-8-

Memphis Police Officer Jeffrey Jordan testified that he and Officer Baker were the first officers to arrive at the crime scene and that they saw a white Chevy van in the driveway with the motor running. He said they turned off the motor and then heard some commotion coming from the rear of the house. He said it sounded like a bunch of people running around, throwing things. He said he went to the left of the house, kicked the fence in, and walked around the corner of the house. He said he saw a black pistol by the swimming pool and heard the commotion moving away from him. He said he followed the sounds to another fence which separated the victim's backyard from the neighbor's property. He said that the end of the fence jutted over the lake and that he saw wet footprints and a dock on the other side. He said that he also saw one of the suspects lying in the grass on the neighbor's property about twenty-five feet from the fence and asked him how he got there. He said the suspect replied he was in the adjacent yard inspecting the estate because he was interested in purchasing the property when a group of men came running from the house. He said the victim's checkbook, driver's license, and wallet were lying at the suspect's feet. He said that the suspect's ankle was injured and that the officers had to help him get to the police car.

Memphis Police Officer James Baker testified that he and Officer Jordan arrived at the crime scene at the same time. He said he positioned his patrol car in the driveway to block a white van which had a broken window and popped steering column. He said the van was parked but the motor was running. He said that he headed for the backyard by the right side of the house and heard Officer Jordan yell that someone was running to the right. He said Officer Jordan ordered the suspect to halt and he did. He said they then found footprints leading through the yard to the adjacent property and began searching the perimeter of the yard. He said he saw two boots sticking out from underneath some bushes near the dock, with the remainder of the body lying underneath the pier. He said that he asked the [Petitioner] to come out but that the [Petitioner] replied he could not because his legs were broken. He said that the officers pulled him out from under the dock and asked what happened and that the [Petitioner] replied, "Oh, it was just a drug deal gone bad." He

said the [Petitioner] claimed he arrived in the white van parked in front of the house. He said that the officers handcuffed the [Petitioner] and sent for an ambulance to transport him to the hospital.

On cross-examination, Officer Baker acknowledged that he patted down the [Petitioner] when he was removed from under the dock in a search for weapons and said that he removed a flashlight. He said he did not search inside the [Petitioner]'s pockets.

State v. Larry Holmes, No. W2004-01576-CCA-R3-CD, Shelby County, slip op. at 1-6 (Tenn. Crim. App. July 15, 2005), perm. app. denied (Tenn. Dec. 19, 2005).

In the direct appeal of his convictions, the Petitioner argued that the evidence was insufficient to support his convictions, that the trial court erred by denying his motion for a mistrial, and that the trial court erred in sentencing. Regarding his sentences, he contended,

The sentences imposed on Defendant Holmes are excessive, not only because the severity is not supported fairly by the facts, but more importantly because while the elements of Especially Aggravated Kidnapping and Aggravated Robbery do, to some extent over lap, Defendant Holmes was unfairly sentenced under a Class A felony rather than a Class A and Class B felony for two separate indicted crimes arising out of the same singular set of facts. It is as though the Court and not the Legislature has decided that the crime of Home Invasion and the taking of personal property shall be sentenced as one "super-sized" offense.

Id., slip op. at 10. This court noted that the Petitioner's appellate counsel had not included a transcript of the sentencing hearing in the appellate record and stated, "[W]e are at a loss to determine what he is asking this court to consider. Because we cannot decipher his contention and his brief on this issue is devoid of citations to authorities or sound argument, this issue is waived." Id., slip op. at 11 (citing Tenn. Ct. Crim. App. R. 10(b)).

The Petitioner filed a petition for post-conviction relief alleging that the trial court violated his due process rights when it merged his convictions for especially aggravated kidnapping and aggravated robbery, rather than dismissing the convictions for especially aggravated kidnapping as incidental to the robberies. The Petitioner also argued that counsel

-10-

was ineffective for failing to include the transcript of the sentencing hearing in the appellate record and for inadequately articulating the sentencing issue on appeal.

At the post-conviction hearing, the Petitioner testified that he hired counsel to represent him at the trial and on appeal. He was incarcerated from the time of his arrest and met with counsel at the jail approximately three times, with little to no communication otherwise. The Petitioner claimed that he could not understand counsel's explanation of legal matters because he had a seventh-grade education. He said that he was a victim of the robbers, not a perpetrator, and that when he arrived at the scene, the robbers assaulted him with a bat and threw him in the lake near the house. The Petitioner testified that counsel did not present a defense at the trial. He recalled a case named State v. Anthony being discussed at the motion for new trial hearing and at sentencing. He said that he did not communicate with counsel about the appeal process or what counsel planned to argue on appeal. The Petitioner said that counsel requested an oral argument but waived it due to a procedural matter and that counsel waived the sentencing issue presented on appeal because counsel did not "make it clear what he was asking for."

On cross-examination, the Petitioner stated that he met with counsel four to five times. He further stated that a friend hired counsel on his behalf. The Petitioner said he complained to his family about counsel's representation but not to the friend who hired counsel or to the trial judge.

Counsel testified that he had known the Petitioner since 1995 and that he represented the Petitioner before the instant case. He said he thought the Petitioner's version of the circumstances surrounding the offenses in this case was not "juror friendly" because it involved the sale of cocaine. Counsel said the Petitioner had eight prior felony convictions. He did not remember what occurred at the sentencing hearing. Counsel testified that he did not know why the sentencing transcript was not filed with the rest of the trial documents. He stated that the trial judge correctly analyzed the Anthony issue and that the merger of the aggravated robbery convictions and the especially aggravated kidnapping convictions was the correct outcome. He said, however, that he wanted the judge to sentence the Petitioner on the aggravated robbery convictions rather than the especially aggravated kidnapping convictions. He said he preserved the issue for appeal and included it in his motion for a new trial. At the time, he did not suggest that the correct disposition would have been to dismiss the kidnapping convictions. Counsel said he considered Anthony to be a double jeopardy issue rather than a due process issue.

On cross-examination, counsel testified that he thought the kidnapping of the victims in this case went beyond that necessary to accomplish the robbery. He said the Petitioner filed a complaint about not receiving documents against him with the Board of Professional

-11-

Responsibility during the appellate process. Counsel explained that as a result of the complaint, he discovered that new federal laws were causing some inmates not to receive their mail. He said the Petitioner's complaint disrupted his work on the Petitioner's appeal.

After considering the testimony and the evidence presented, the trial court concluded that counsel's representation on appeal was "within the range of reasonable professional assistance." The court dismissed the Petitioner's claim that the trial court erred when sentencing him on the especially aggravated kidnapping convictions, reasoning that the issue was waived as a result of his failing to present the issue fully on direct appeal.

On appeal, the Petitioner contends that the trial court erred by merging his aggravated robbery convictions into his especially aggravated kidnapping convictions, rather than dismissing the especially aggravated kidnapping convictions. He further contends that counsel's representation on appeal was ineffective because counsel failed to articulate the Anthony issue. The State responds that the trial court properly ruled that the Petitioner had waived the Anthony issue and that counsel's appellate representation did not prejudice the outcome of the proceeding.

The burden in a post-conviction proceeding is on the petitioner to prove his grounds for relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456-57 (Tenn. 2001). Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457. Post-conviction relief may only be given if a conviction or sentence is void or voidable because of a violation of a constitutional right. T.C.A. § 40-30-103 (2006).

**I**

The Petitioner argues that the trial court should have dismissed his especially aggravated kidnapping convictions under State v. Anthony, 817 S.W.2d 299 (Tenn. 1991). He characterizes the kidnapping convictions as "incidental" and contends that due process does not permit convictions for both aggravated robbery and especially aggravated kidnapping. The State responds that the Petitioner waived the issue because it was not raised on direct appeal and that the Petitioner has not demonstrated constitutional error on the merits of the issue. We hold that the issue is waived as a free-standing constitutional claim.

In the conviction proceedings, the trial court merged the Petitioner's aggravated robbery convictions with his especially aggravated kidnapping convictions and sentenced the

Petitioner for the especially aggravated kidnapping convictions. On appeal, this court noted that the sentencing hearing transcript was not included in the appellate record. Regarding the sentencing argument, this court said, "We are at a loss to determine what [the Petitioner] is asking for in his brief," and held that consideration of the issue was waived because the court could not determine the Petitioner's contention. The court also noted that the Petitioner's brief did not contain citations to authorities or sound argument. Despite the lack of clarity in the Petitioner's sentencing argument on direct appeal, we note that trial counsel raised a sentencing issue relative to the especially aggravated kidnapping convictions on direct appeal, not a due process issue with the convictions themselves. We also note that in the present post-conviction action, the Petitioner has raised the due process issue as a free-standing claim but has not raised an issue of ineffectiveness of trial counsel in failing to raise the due process issue in the conviction proceedings.

Our post-conviction statute provides for waiver of issues that could have been, but were not raised in a previous proceeding. T.C.A. § 40-30-106(g) (2006). The trial court merged the aggravated robbery and especially aggravated kidnapping convictions. The Petitioner's claim that the especially aggravated kidnapping convictions should have been dismissed, rather than merged, could have been raised in the direct appeal. Because it was not, consideration of it at this juncture is waived. See, e.g., House v. State, 911 S.W.2d 705, 713-14 (Tenn. 1995).

We note, though, that the Petitioner based his ineffective assistance claim in part on counsel's failure to address the Anthony issue properly as part of his sentencing argument on appeal. We will address the issue below in that context.

## II

The Petitioner argues that trial counsel provided ineffective assistance on direct appeal by failing to include the transcript of the sentencing hearing in the record and by failing to present a coherent sentencing argument. The State responds that the trial court properly denied relief because the Petitioner did not establish that he was prejudiced by counsel's performance.

Under the Sixth Amendment, when a claim of ineffective assistance of counsel is made, the burden is on the Petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). In other words, a showing that counsel's performance fell below a reasonable standard is not enough because the Petitioner must also show that but for the substandard performance, "the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The Strickland

-13-

standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the Strickland test. Henley v. State, 960 S.W.2d 572, 580 (Tenn. 1997). The performance prong requires a petitioner raising a claim of ineffectiveness to show that the counsel's representation fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. The prejudice prong requires a petitioner to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability means a "probability sufficient to undermine confidence in the outcome." Id.

In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court decided that attorneys should be held to the general standard of whether the services rendered were "within the range of competence demanded of attorneys in criminal cases." Further, the court stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687, 696 (6th Cir.1974), and United States v. DeCoster, 487 F.2d 1197, 1202–04 (D.C. Cir. 1973). Baxter, 523 S.W.2d at 936. Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689; see Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance. Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. See DeCoster, 487 F.2d at 1201; Hellard, 629 S.W.2d at 9.

As we have noted, trial counsel raised a sentencing issue but failed to supplement the direct appeal record with the transcript of the sentencing hearing. See Larry Holmes, slip op. at 13-14. Due to insufficiencies in trial counsel's argument relative to sentencing, this court treated the sentencing review as waived. Counsel's failures in this respect were deficient performance.

The remaining question is whether the Petitioner was prejudiced by counsel's shortcomings. The Petitioner contends that there was not sufficient proof to support independent convictions for both aggravated robbery and especially aggravated kidnapping and that the absence of the sentencing transcript and adequate argument prevented the appellate court from dismissing the especially aggravated kidnapping convictions on due

process grounds. Regarding the question of prejudice, we note that the trial court merged the aggravated robbery convictions with the higher-grade especially aggravated kidnapping convictions and sentenced the Petitioner for the greater offenses. This court held in the Petitioner's direct appeal that sufficient proof supported the merged convictions. We note, as well, that in the jointly tried co-defendant's appeal, this court said the following with respect to the co-defendant's Anthony claim that arose under the same facts and in the same trial proceeding as the Petitioner's:

> In our view, the confinement of the victims was beyond that necessary for the commission of the aggravated robberies. The defendant [Jones] and his accomplices [one of whom was the Petitioner] were armed with handguns and used them to subdue the victims. They chose to further restrain the victims by handcuffing them behind their backs, requiring them to lie face-down. Ms. Boyce was the only robbery victim. The perpetrators, however, chose to confine all of the occupants of the residence. The two teenaged boys downstairs had slept through the break-in and, behind the closed door of their bedroom, were not an apparent threat to the defendant and his cohorts. Nonetheless, the boys were awakened, cuffed, and moved to the hallway with Ms. Boyce's brother. After learning that one of Ms. Boyce's children, the one who had fled to a neighbor's residence, was unaccounted for, the perpetrators were determined to find and confine him as well. This demonstrates a separate intent from robbery. That the police arrived and interrupted the crimes, preventing further physical harm to the victims, does not change the analysis. The handcuffing of the victims would have hindered their efforts to seek aid, increased their risk of harm, and lessened the defendant's risk of detection.
>
> In support of his argument, the defendant specifically directs this court to State v. Coleman, 865 S.W.2d 455 (Tenn. 1993). In Coleman, the defendant forced the victim, a shoe store clerk, to empty the cash register at gunpoint. After his accomplice left with the money, the defendant directed the victim into a back room, where he ordered her to undress, raped her, and, before leaving, instructed her not to get up. 865 S.W.2d at 456-57. The defendant was convicted of armed robbery, aggravated rape, and aggravated kidnapping. Our high

-15-

court, however, reversed the kidnapping conviction pursuant to Anthony.

> In our view, the facts of Coleman are distinguishable from the facts in this case. In Coleman, the victim was not physically restrained and was directed to the back room of the store to facilitate the rape. After the assault, the defendant did not lock or otherwise block the door. In this case, however, each of the victims was handcuffed behind his or her back and forced to lie face-down, a position which rendered them defenseless and largely immobilized. Accordingly, the defendant is not entitled to relief on this issue.

State v. Lacey Jones, No. W2004-01628-CCA-R3-CD, Shelby County, slip op. at 3 (Tenn. Crim. App. Aug. 4, 2005), perm. app. denied (Tenn. Dec. 19, 2005).

When faced with the question of merger of the aggravated robbery convictions with the especially aggravated kidnapping convictions in the co-defendant's direct appeal, this court said:

> Initially, the two aggravated robbery convictions are for the taking of jewelry from Trina Boyce. The state merely charged the defendant [Jones] with different theories of culpability. Accordingly, it would have been both necessary and appropriate for the trial court to have merged one conviction into the other. That having been said, the trial court did not, in our view, exceed its authority when it merged the defendant's aggravated robbery convictions into the convictions for especially aggravated kidnapping. As already determined, the dual convictions for aggravated robbery and especially aggravated kidnapping did not violate the principles of due process. Nevertheless, the trial court merged the convictions and declined to sentence the defendant separately for the aggravated robbery. With regard to merger, this court has previously stated that "'the trial court has the power to enter the appropriate judgment. This authority does not impinge upon or amend the verdict so long as the judgment does not subject the defendant to a conviction and sentence which exceeds the jury's determination of culpability.'" State v. Price, 46 S.W.3d 785, 825 (Tenn. Crim. App. 2000) (quoting State v. Hill, 856 S.W.2d

-16-

155, 157 (Tenn. Crim. App. 1993)). Had the trial court not merged the offenses, the defendant would have been exposed to an additional consecutive sentence. Thus, any error inured to the benefit of the defendant and does not give rise to relief.

Lacey Jones, slip op. at 4. Given this court's ruling in the jointly tried co-defendant's direct appeal, we conclude that the Petitioner would not have obtained relief had trial counsel presented a complete record on appeal and adequately argued that the especially aggravated kidnapping convictions and the resulting sentences violated due process. The Petitioner, thus, has not shown that he was prejudiced by trial counsel's deficient performance. The Petitioner is not entitled to relief.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE